# Exhibit A

## BIOSOLIDS RAIL TRANSPORTATION AND DISPOSAL

### SERVICE AGREEMENT

THIS BIOSOLIDS RAIL TRANSPORTATION AND DISPOSAL SERVICE AGREEMENT (this "**Service Agreement**") is made as of the 1st day of July, 2014, by and between Environmental Protection & Improvement Company, LLC, a New Jersey limited liability company having its principal office at 227 R206, Building 1, Box 31, Flanders, New Jersey 07836 ("**Service Provider**"), and WeCare Organics LLC, a New York limited liability company, having its principal office at 9293 Bonta Bridge Road, Jordan, NY 13080 ("**Company**," and, together with Service Provider, the "**Parties**" or either one individually, a "**Party**").

### WITNESSETH:

WHEREAS, the Company and the City of New York acting by and through the Commissioner of the Department of Environmental Protection ("**NYC**") entered into an agreement dated October 25, 2013 relative to biosolids transportation and disposal services, which agreement is known as the Contract 1308-BIO (the "**NYC Agreement**") ; and

WHEREAS, the Company desires to have certain requirements of the NYC Agreement performed by a service provider, including biosolids transportation and disposal; and

WHEREAS, Service Provider owns and/or operates a rail transportation facility known as the Brills Yard in Newark, New Jersey (the "**Service Provider Facility**") capable of transporting the biosolids for landfill disposal and Service Provider has the capability of providing transportation and landfill disposal services as required hereunder;

NOW, THEREFORE, in consideration of the mutual covenants and conditions herein contained, the Parties hereto mutually agree as follows:

# ARTICLE I

## DEFINITIONS AND CONSTRUCTION

Section 1.1    **General Obligations.**    The Service Provider shall be responsible for all obligations set forth for it herein.

Section 1.2    **Definitions.**    When capitalized and used in this Service Agreement the following terms have the meanings set forth below:

**"Acceptable Biosolids"** means Biosolids which: (a) comply with all applicable federal, state and local laws and regulations, including but not limited to 40 C.F.R. §§ 503 et seq., (b) are not Hazardous Waste, (c) do not otherwise deviate in any material respect from general industry standards for Biosolids, and (d) have been provided to the Company under the NYC Agreement.

**"Applicable Laws"** means all laws, rules, ordinances, rulings and regulations, in effect as of the Contract Date, of any federal, state or local Governmental Authority having jurisdiction over the Company, the Service   or the Services, including, without limitation, any such Environmental Laws.

**"Applicable Permits"** means any permit, authorization, license or similar Governmental Approval required by Applicable Laws to be obtained or maintained in connection with the Company, the Service Provider Facility or the Service Provider Services.

**"Biosolids"** means the digested sludge and sludge cake produced by a wastewater treatment plant as a result of the treatment process, but not including grit and screenings. Biosolids provided to Service Provider shall be dewatered to a monthly average minimum of 22% dry solids content.

"**Business Day**" means for all purposes other than as covered by subsection below, a day other than a Saturday, Sunday or other day on which commercial banks in the State of New York are authorized or required by Applicable Law to close.

**"CERCLA"** means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended 42 U.S.C. §§ 960, et seq.

2

**"C.F.R."** means the Code of Federal Regulations.

**"Change in Law"** means (a) the enactment, adoption, amendment, promulgation, modification, change of interpretation or repeal after the Contract Date by any governmental authority of any federal, state or local statute, ordinance, code, rule, regulation or executive order that was not so enacted, adopted, promulgated, modified, interpreted or repealed on or before the Contract Date, or (b) the imposition by, or a change of interpretation by, a Governmental Authority after the Contract Date of any material conditions in connection with the issuance, renewal or modification of any official permit, license or approval, which in the case of either (a) or (b) establishes requirements more burdensome than the most stringent requirements applicable to the Services provided for herein as of the Contract Date.

**"Contract Date"** means the date of execution of this Service Agreement.

**"Environmental Laws"** means all federal, state and local laws, rules, ordinances, rulings and regulations in effect as of the Contract Date relating to pollution or protection of human health or the environment (including, without limitation, ambient air, surface water, ground water, wastewater, land surface or subsurface strata), including, without limitation, laws, rules, ordinances, rulings and regulations relating to emissions, discharges, releases or threatened releases of Hazardous Waste, or otherwise relating to the manufacture, processing, refining, distribution, use, treatment, storage, disposal, transport, recycling, reporting or handling of Hazardous Waste, and including, without limitation, such laws, rules, ordinances, rulings and regulations as applied to or because of the generation, transportation, treatment or disposal of Biosolids.

**"EPA"** means the United States Environmental Protection Agency.

**"Governmental Approval"** means (a) any authorization, consent, approval, license, lease, ruling, permit, tariff, rate, certification, exemption, filing, variance, claim, order, judgment, decree or publication of, by or with, (b) any notice to, (c) any declaration of, or any registration with, any Governmental Authority.

**"Governmental Authority"** means any federal, state, municipal, local, territorial or other governmental department, commission, board, bureau, agency, regulatory

3

authority, instrumentality, or judicial or administrative body.

**"Hazardous Waste"** means materials, the handling, transportation, management or processing of which would subject Service Provider to liability under, or would otherwise contravene, Subtitle C of the Resource Conservation and Recovery Act of 1976, 42 U.S.C. §§ 6901 et seq., CERCLA or any analogous state law.

**"NYC"** means the City of New York acting through its Commissioner of the Department of Environmental Protection, and its successors and assigns.

**"NYC Biosolids"** means Acceptable Biosolids that are made available to the Company, pursuant to the NYC Agreement, which in turn are made available to Service Provider pursuant to this Service Agreement.

**"Service Fees"** means those fees outlined in Article V.

**"Service Agreement"** means this Biosolids Rail Transportation and Disposal Service Agreement between Service Provider and the Company, together with all the Exhibits and Schedules hereto, as the same may from time to time be amended, modified or supplemented in accordance with the terms hereof.

**"Service Provider Services"** means all those services set forth for Service Provider in this Service Agreement.

**"Ton"** means a "wet ton", which is a short ton of two thousand (2,000) pounds.

**"Unacceptable Biosolids"** means all Biosolids other than Acceptable Biosolids.

4

**Section 1.3** **Construction.** In this Service Agreement:

(a) the terms "hereby", "hereof", "hereto", "herein", "hereunder" and any similar terms refer to this Service Agreement;

(b) words of the masculine gender shall mean and include correlative words of the feminine and neuter genders and words importing the singular number shall mean and include the plural number and vice versa;

(c) any headings preceding the text of the several Articles and Sections of this Service Agreement, and any table of contents hereto, shall be solely for convenience of reference, shall not constitute a part of this Service Agreement, and shall not affect its meaning, construction or effect;

(d) all Exhibits and Schedules attached to this Service Agreement shall be considered to be incorporated within any Section or Article hereof solely by reference thereto;

(e) all references to the term of this Service Agreement, without further specification, shall include all extensions and renewals hereof (if any);

(f) all references to Exhibits, Schedules, Articles or Sections, without further identification of the document in which they are located, are references to Exhibits to, Schedules to, Articles of or Sections of this Service Agreement, as the case may be;

(g) the term "hereafter" means after the Contract Date of this Service Agreement; and

(h) the terms "day" or "days" refer to calendar day(s).

# ARTICLE II

# TERM OF AGREEMENT

**Section 2.1** **Term.** The term of this Service Agreement shall begin on the Contract Date and end on December 31, 2014, unless extended by mutual agreement of the Parties or earlier terminated in accordance with Article VII (the "**Term**").

## ARTICLE III

## SERVICE PROVIDER SERVICES

**Section 3.1  <u>Acceptance of Biosolids; Loading and Unloading.</u>**  Service Provider shall accept and Company shall deliver for rail transportation and disposal no less than 1,250 Tons of Acceptable Biosolids each week during the months of July, August and through September 30, 2014. During the months of October through December 31, 2014, the minimum volume shall be the lesser of 1,250 Tons per week or 50% of the volume received by Company under the NYC Agreement, but in no event less than 1,040 Tons per week; provided,  however, that in no event shall Service Provider be required to accept more than 300 Tons per day on any Saturday or Sunday. If the Company delivers in excess of 300 Tons on any given Saturday or Sunday, such excess shall not count toward fulfilling Company's minimum delivery obligation set forth in Section 5.1(a)(v).  At the Service Provider Facility, Service Provider shall remove Containers (as defined below) from Company's truck chassis and load such Containers onto rail cars.  Service Provider shall also load empty Containers onto Company's truck chassis.

**Section 3.2   <u>Transportation and Disposal of Biosolids.</u>**  Service Provider shall transport by rail for disposal all Acceptable Biosolids received pursuant to Section 3.1 to landfills approved by NYC.

**Section 3.3   <u>Containers; Chassis.</u>**  Service Provider shall provide containers for use by the Company.  Such containers shall have the capacity to hold either 28 cubic yards (each, a "**Small Container**") or 32 cubic yards (each, a "**Large Container**" and, together with the Small Containers, each a "**Container**" and, collectively, the "**Containers**") of Acceptable Biosolids. During the Term, Service Provider shall make a good faith effort to provide the Large Container to Company the majority of the time and only substitute Small Containers when the supply of Large Containers is limited.  Subject to availability, Service Provider may also provide chassis to the Company.  Company shall be solely responsible for damage to Service Provider's Containers or chassis which damage occurs while such Container(s) or chassis are in the possession of the Company or any of

6

the Company's subcontractors (other than Service Provider).

### Section 3.4  Service Provider Facility.

(a)     At the Company's request, Service Provider shall confirm that it owns and operates, in accordance with all Applicable Laws and Applicable Permits, the permitted Service Provider Facility.

(b)     The Service Provider Facility has received all Applicable Permits and is operational in accordance with all Applicable Laws, ready to accept for transportation Acceptable Biosolids in accordance with this Service Agreement.

### Section 3.5     Expenses.  Service Provider will arrange for provide and pay any and all of its own costs, rail transportation fees and expenses incurred in providing the Service Provider Services, including but not limited to costs relative to all materials, labor, tools, equipment, containers, utilities, supplies, transportation, administration, insurance, incidentals and disposal services necessary for the rendering of the Service Provider Services. Service Provider shall not pay or be liable for any other expenses related to the Subcontract Services including but not limited to costs related to receipt, handling and disposal of Unacceptable Biosolids.

### Section 3.6     Compliance with Applicable Laws/Standard of Services.

Service Provider shall comply with and shall perform all Service Supplier Services in compliance with all Applicable Laws as they may be in effect at the time of Service Provider's performance hereunder. Service Provider shall at all times provide services in accordance with good industry standards. Notwithstanding anything contained herein to the contrary, in the event, following the Contract Date, a Change in Law occurs that imposes significantly more stringent obligations upon Service Provider and specifically materially adversely affects Service Provider's ability to perform its obligations hereunder, the Parties agree to negotiate in good faith an adjustment to the Service Fee to reasonably compensate Service Provider to perform its obligations hereunder in compliance with said Change in Law. If the Parties are unable to agree to such adjustment, then Service Provider shall have the right upon 20 days' written notice to Company to terminate this Service Agreement.

**Section 3.7**     **Record Keeping and Reporting.**

(a)     Service Provider shall maintain all information required by Applicable Law and the NYC Agreement, and shall provide copies of such records and paperwork to the Company, upon request, including, without limitation, such records and paperwork relating to or evidencing Service Provider's proper transportation and disposal of NYC Biosolids it receives as part of the Service Provider Services.

(b)     Service Provider shall provide the Company in writing the following operating data for the billing periods covered by invoices for payment submitted under Article V: (1) the quantity of NYC Biosolids received at the Service Provider Facility; and (2) the landfills at which the NYC Biosolids were delivered for disposal.

**Section 3.8**     **Notice of Violations.**     During the Term, Service Provider shall immediately notify the Company upon receipt of or knowledge of impending issuance of any notice of violation or permit variance by any competent authority with jurisdiction over the Service Provider Facility or the Service Provider Services.

**Section 3.9**     **Certain Representations and Warranties.** Service Provider represents and warrants to Company that:

(a)     it is a limited liability company, duly organized, validly existing and in good standing under the laws of the New Jersey;

(b)     it has the full right, power and authority to enter into this Service Agreement and to perform its obligations hereunder;

(c)     the execution of this Service Agreement by the individual whose signature is set forth at the end of this Service Agreement, and the delivery of this Service Agreement by Service Provider, have been duly authorized by all necessary action on the part of Service Provider;

(d)     the execution, delivery and performance of this Service Agreement by Service Provider will not violate, conflict with, require consent under or result in any breach or default under any Applicable Law or the provisions of any contract or agreement to which Service Provider is a party or to which any of its material assets are bound; and

(e)    this Service Agreement has been executed and delivered by Service Provider and (assuming due authorization, execution and delivery by Company) constitutes the legal, valid and binding obligation of Service Provider, enforceable against Service Provider in accordance with its terms, except as may be limited by any applicable bankruptcy, insolvency, reorganization, moratorium, or similar laws and equitable principles related to or affecting creditors' rights generally or the effect of general principles of equity.

## ARTICLE IV

## OBLIGATIONS OF THE COMPANY

**Section 4.1    Commitment to Tender NYC Biosolids.** Commencing on the date hereof, the Company shall deliver to the Service Provider Facility for transportation and disposal up to a minimum of 1,250 Tons of Acceptable Biosolids each week during the term hereof; provided, however, that in no event shall the Company deliver more than 300 Tons per day on any Saturday, Sunday or holiday. Company's haulers making such deliveries shall have a current hauling agreement on file with Service Provider or an affiliate of Service Provider.

**Section 4.2    Delivery Requirements.** The Company shall deliver only Acceptable Biosolids in Service Provider's Containers using subcontractors approved by NYC. Each delivery shall be accompanied by weigh tickets from a certified scale showing the empty and full weight of each load tendered by the Company at the Service ProviderFacility.

**Section 4.3    Unacceptable Biosolids.**

(a)    The Company shall provide Service Provider with copies of any test results of the NYC Biosolids performed by NYC or the Company. Service Provider shall at all times have the right, but not the obligation, to test and analyze, at its own cost, NYC Biosolids to determine whether the NYC Biosolids are Acceptable Biosolids. All such testing and analysis shall be conducted and performed by New York or federal certified laboratories and other qualified personnel. Service Provider shall promptly give the Company copies of any test results that indicate that NYC Biosolids are Unacceptable Biosolids and shall provide the Company with one (or more at the request

of the Company) split samples of any such NYC Biosolids.

(b)     If the Company knows or determines that the NYC Biosolids to be delivered to Service Provider during a specified period of time will be Unacceptable Biosolids, the Company shall promptly notify Service Provider in writing, describing in detail why such NYC Biosolids are Unacceptable Biosolids.

(c)     If Service Provide rhas determined that the Company has provided Unacceptable Biosolids, it shall immediately notify the Company of the details of same. At the Company's request and sole cost, Service Provide rmay, but shall not be obligated to, arrange for the disposal of all NYC Biosolids made available to Service Provider that are Unacceptable Biosolids. The fee for any such transportation and disposal shall be the actual costs thereof (including internal costs) plus 20%.

(d)     Company shall not knowingly deliver any Biosolids at the Service Provider Facility the acceptance, rail-transporting or disposal of which would cause a violation of any Applicable Laws, Applicable Permits or the NYC Agreement.

**Section 4.4    Compliance with Applicable Laws.** Company shall comply with all Applicable Laws as they may be in effect from time to time.

**Section 4.5    Notice of Violations.**     During the Term, Company shall immediately notify the Service Provider upon receipt of or knowledge of impending issuance of any notice of violation or permit variance by any competent authority with jurisdiction over the Company.

**Section 4.6    NYC Approval.** To the extent required by the NYC Agreement, Company has obtained the approval of NYC of Service Provider to be a subcontractor under the NYC Agreement. Service Provider agrees to provide all documentation and paperwork relating to it and the Service Provider Services required under the NYC Agreement and as otherwise reasonably requested by the Company.

**Section 4.7** **Certain Representations and Warranties.** Company represents and warrants to Service Provider that:

(a)     it is a limited liability company, duly organized, validly existing and in good standing under the laws of the New York;

(b)     it has the full right, power and authority to enter into this Service Agreement and to perform its obligations hereunder;

(c)     the execution of this Service Agreement by the individual whose signature is set forth at the end of this Service Agreement, and the delivery of this Service Agreement by Company, have been duly authorized by all necessary action on the part of Company;

(d)     the execution, delivery and performance of this Service Agreement by Company will not violate, conflict with, require consent under or result in any breach or default under any Applicable Law or the provisions of any contract or agreement to which Company is a party or to which any of its material assets are bound; and

(e)     this Service Agreement has been executed and delivered by Company and (assuming due authorization, execution and delivery by Service Provider) constitutes the legal, valid and binding obligation of Company, enforceable against Company in accordance with its terms, except as may be limited by any applicable bankruptcy, insolvency, reorganization, moratorium, or similar laws and equitable principles related to or affecting creditors' rights generally or the effect of general principles of equity.


## ARTICLE V

## FEES

**Section 5.1** **Service Fees.**

(a)     As more specifically set forth in this Article V, in consideration of the Service Provider Services provided by Service Provider pursuant to this Service Agreement, Service Provider shall receive the Service Fees from the Company as follows:

(i)     For each Small Container load delivered by the Company to the

Service Provider Facility: $1,436.40.

(ii)    For each Large Container load delivered by the Company to the Service Provider Facility: $1,512.00.

(iii)    If the average monthly load weight for Small Container loads exceeds 22.8 Tons for that month, a surcharge of $35 per Ton for each excess Ton delivered.

(iv)    If the average monthly load weight for Large Container loads exceeds 24 Tons for that month, a surcharge of $35 per Ton for each excess Ton delivered.

(v)    If the total number of Tons delivered in during any month is less than the minimum Tons set forth in Section 5.1(a)(vi), a surcharge of $63 per Ton for each Ton less than such minimum Tons requirement.

(vi)    For the months of October through December 31, 2014, the minimum requirement on a monthly basis shall be the lesser of 5,412 Tons per month or 50% of the monthly volume received by Company under the NYC Agreement, but in no event less than 4,500 Tons per month.

**Section 5.2**    **<u>Invoices and Payment.</u>** After the end of each month, Service Provider shall invoice the Company for services rendered during the prior month. Invoices shall contain at a minimum the Tons of each NYC Biosolids load accepted and transported by Service Provider along with all required paperwork so Company can properly invoice NYC in a timely manner and otherwise in accordance with the NYC Agreement. The Company shall make payment within thirty (30) days of its receipt of an invoice for the Service Provider Services. Late payments shall accrue interest at the lower of 1.5% per month or the maximum amount allowable by law. Should any payment be delinquent, Company shall arrange for, and render all assistance to and cooperate with, Service Provider to promptly arrange for a prepayment requirement, payment security, an assignment of Company's receivable from NYC, a two-party check requirement with NYC, a direct pay arrangement with NYC, or some other arrangement to mitigate Service Provider's risk from non-payment by Company. Service Provider may suspend performance hereunder if Company fails to implement such mitigation within 5 business days after a

payment delinquency.

## ARTICLE VI

## INSURANCE OBLIGATIONS

**Section 6.1**   **General.**

(a)   Service Provider shall provide proof of insurance in the form provided for in Sections 6.2 and 6.3 hereof, and keep such insurance in full force and effect during the Term of this Service Agreement.

(b)   Insurance coverage shall be evidenced by a Certificate of Insurance submitted in a form reasonably acceptable to the Company.

(c)   Insurance coverage shall be provided by (i) an insurance company licensed to provide insurance in the State of New York and that has an A.M. Best or S&P Insurance Rating minimum of "A" or (ii) a surplus line carrier authorized to write business in the State of New York that has an A.M. Best or S&P Insurance Rating minimum of "A".

**Section 6.2**   **Required Coverage.** Prior to the commencement of any Service Provider Services through the Term of this Service Agreement, each of the Company and Service Provider shall obtain and keep or shall cause its subcontractors or independent contractors and their respective representatives to obtain and keep in force during the Term of this Service Agreement the following insurance:

(a)   Commercial general liability on an occurrence basis to include all operations and premises coverages, protective liability, products liability, and broad form general liability for limits of not less than $1,000,000 each occurrence and $2,000,000 aggregate limits. A per location aggregate shall apply. Service any subcontractors shall include the Company and NYC as additional insureds on a primary non-contributing basis and Company shall include Service Provider as an additional insured on a primary non-contributing basis;

(b)   Comprehensive Automobile Liability to include all owned, hired, leased and non-owned vehicles for a combined single limit (CSL) of

liability of $1,000,000 each accident. Service Provider and its subcontractor shall include the Company and NYC as additional insureds on a primary non-contributing basis and Company shall include Service Provider as an additional insured on a primary non-contributing basis;

      (c)        Statutory workers compensation for all of Service Provider's employees and its subcontractors' or independent contractors' and their respective representatives and employees, complying with the statutes of the State of New York, to include an Employers Liability B coverage limit of $500,000/$500,000;

      (d)        Pollution Liability with limits of $5,000,000 each occurrence, $5,000,000 each pollution condition to include damages due to claims for "bodily injury", "property damage" or "cleanup costs" that result from "pollution conditions" at, on or emanating from the Service Provider Facility. A policy shall provide coverage for pollution conditions from transported cargo when a loss occurs suddenly and accidentally. The liability limit for pollution conditions coverage from transported cargo shall be $1,000,000. Service Provider and its subcontractor shall include the Company and NYC as additional insureds on a primary non-contributing basis and Company shall include Service Provider as an additional insured on a primary non-contributing basis; and

      (e)        Umbrella Liability Policy for limits of $5,000,000 Bodily Injury and Property Damage limit each occurrence with a self-retention not to exceed $250,000. All limits of the general liability, automobile liability and workers compensation conforming to the minimum underlying requirements of the umbrella liability policy. Service Provider and its subcontractor shall include the Company and NYC as additional insureds on a primary non-contributing basis and Company shall include Service Provider as an additional insured on a primary non-contributing basis.

      **Section 6.3**   **Waivers.** Service Provider and its subcontractors and agents shall waive all rights against the Company and NYC and their agents, officers, directors and employees for recovery of damages to the extent these damages are covered by commercial general liability, commercial auto liability, pollution liability, workers compensation and employers' liability and commercial umbrella liability insurance maintained pursuant to this Article VI. Further Service Provider and its subcontractors

and agents hereby waive all rights of subrogation against the Company and NYC and their agents, officers, directors and employees for Service Provider's insurance carrier to set forth claims against the Company, and NYC and their agents, officers, directors and employees.

Company and its subcontractors (other than Service Provider) and agents shall waive all rights against the Service Provider and its agents, officers, directors and employees for recovery of damages to the extent these damages are covered by commercial general liability, commercial auto liability, pollution liability, workers compensation and employers liability and commercial umbrella liability insurance maintained pursuant to this Article VI. Further Company and its subcontractors (other than Service Provider) and agents hereby waive all rights of subrogation against the Service Provider and its agents, officers, directors and employees for Company's insurance carrier to set forth claims against the Service Provider and its agents, officers, directors and employees.

## ARTICLE VII

## DEFAULT AND TERMINATION

**Section 7.1**     **Events of Default by Service Provider.**  Each of the following shall constitute an "**Event of Default**" on the part of Service Provider:

(a)     The failure or refusal by Service Provider to fulfill any of its material obligations under this Service Agreement; provided, however, that no such failure or refusal shall constitute an Event of Default unless Service Provider shall have failed to correct such default within thirty (30) days, or such longer period as the Parties may agree; or

(b)     Any material misrepresentation by Service Provider in this Service Agreement with respect to the representations and warranties contained herein.

**Section 7.2**     **Events of Default by the Company.**  Each of the following shall constitute an Event of Default on the part of the Company:

(a)     The failure by the Company to pay any amount when due pursuant to the terms of this Service Agreement;

(b)     The failure or refusal by Company to fulfill any of its other material obligations under this Service Agreement; provided, however, that no such failure or refusal shall constitute an Event of Default unless Company shall have failed to correct such default within thirty (30) days, or such longer period as the Parties may agree; or

(c)     Any material misrepresentation by Company in this Service Agreement with respect to the representations and warranties contained herein.

### Section 7.3     Remedies for Default.

(a)     Upon the occurrence of an Event of Default by a Party hereto, the non-defaulting Party shall have the right to:  (i) seek damages and continue to perform its obligations under this Service Agreement; or (ii) seek damages and terminate this Service Agreement. A Party's right to seek damages in the event of an Event of Default by the other Party and a termination of this Service Agreement shall survive such termination.

(b)     The failure of either Party to exercise any rights available upon the occurrence of an Event of Default shall in no way constitute a waiver of that Party's rights to exercise its remedies for a subsequent Event of Default.

(c)     Neither the exercise of, nor the failure to exercise, any remedy provided for in this Article VIII will constitute an election of remedies or limit any Party in any manner in the enforcement of any other remedies that may be available to it.

### Section 7.4     Additional Company Termination Rights.  Should

NYC terminate the 1308-Bio Agreement, Company shall have the right to terminate this Service Agreement upon written notice to Service Provider.

### Section 7.5     Obligations upon Termination.  In the event of a

termination in accordance with Section 7.3 or 7.4, any rights, obligations and liabilities on the part of either Party arising under this Service Agreement after the effective date of termination shall be terminated; provided, however, that any liabilities that may arise pursuant to any Section hereof that provides that it shall

survive the termination of this Service Agreement shall survive such termination.  In addition, any right, obligation or liability arising hereunder prior to the effective date of termination or relating to actions or omissions prior to the effective date of termination, shall survive such termination.

**ARTICLE VIII**

**LIABILITY AND INDEMNIFICATION**

**Section 8.1**     **Liability.**     Except as expressly provided in this Service Agreement, neither Party shall be responsible for any liability, indebtedness or other obligation of the other Party.

**Section 8.2**     **Service Provider Indemnification.** Notwithstanding any other provisions of this Service Agreement to the contrary, to the fullest extent permitted by law, and except to the extent caused by the grossly negligent or intentional act or omission of the Company or its representatives, Service Provider agrees to defend, indemnify, protect and hold harmless the Company, its other subcontractors and their representatives, from and against any and all claims (including third-party claims), suits, losses (including direct losses), liabilities, penalties, damages, detriment, costs and expenses, however designated and including reasonable attorneys' fees, for injuries (including death) to persons, or damage to property, or violations of federal, state or local laws, including, but not limited to, violations of Environmental Laws (collectively, **"Damages"**):

(i)     arising out of or in connection with a breach of Service Provider's obligations hereunder or the negligent (including, but not limited to, grossly negligent), willful or intentional acts, errors or omissions of Service Provider, its representatives or any subcontractor engaged by Service Provider pursuant to this Service Agreement; or

(ii)     imposed pursuant to or arising out of any Applicable Laws relating to or arising from Service Provider's performance of, or failure to perform, this Service Agreement, including, but not limited to, under any Environmental Laws regulating the loading, transportation and disposal of NYC

Biosolids, Unacceptable Biosolids, Hazardous Waste, or any other materials.

### Section 8.3    Company Indemnification.

(a) Notwithstanding any other provisions of this Service Agreement to the contrary, to the fullest extent permitted by law, and except to the extent caused by the negligent or intentional act or omission of Service Provider, its subcontractors or their respective representatives, the Company agrees to defend, indemnify, protect and hold harmless Service Provider, its subcontractors and their respective representatives, from and against any and all Damages:

(i)     arising out of or in connection with a breach of the Company's obligations hereunder or the negligent (including, but not limited to, grossly negligent), willful or intentional acts, errors or omissions, or misrepresentations of the Company, its other subcontractors or its representatives; or

(ii)     imposed pursuant to or arising out of any Applicable Laws relating to or arising from the Company's performance of, or failure to perform, this Service Agreement, including, but not limited to, under any Environmental Laws regulating the loading, transportation and disposal of NYC Biosolids, Unacceptable Biosolids, Hazardous Waste, or any other materials.

### Section 8.4    Survival.   The indemnities contained in this Article VIII shall survive cancellation, expiration or termination of this Service Agreement provided that the Indemnified Party seeks indemnity from the Indemnifying Party prior to the expiration of any applicable statute of limitations period.

### Section 8.5    Matters Involving Third Parties.

(a)     If any third party shall notify any Party (the "**Indemnified Party**") with respect to any matter (a "**Third Party Claim**") which may give rise to a claim for indemnification against the other Party (the "**Indemnifying Party**") under this Article VIII, then the Indemnified Party shall promptly notify the Indemnifying Party thereof in writing.

(b)     The Indemnifying Party will have the right at any time to assume

and thereafter conduct the defense of the Third Party Claim with counsel reasonably satisfactory to the Indemnified Party; provided, however, that the Indemnifying Party will not consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without the prior written consent of the Indemnified Party (not to be withheld unreasonably) unless the judgment or proposed settlement involves only the payment of money damages and does not impose an injunction or other equitable relief upon the Indemnified Party.

(c)    Unless and until an Indemnifying Party assumes the defense of the Third Party Claim as provided in Section 8.5(b) hereof, the Indemnified Party may defend against the Third Party Claim in any manner the Indemnified Party reasonably may deem appropriate.

(d)    In no event will the Indemnified Party consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without the prior written consent of the Indemnifying Party (not to be withheld unreasonably).

# ARTICLE IX

## GENERAL PROVISIONS

**Section 9.1**    **Relationship of the Parties.**    Except as otherwise explicitly provided herein, no Party to this Service Agreement will have any responsibility whatsoever with respect to services provided or contractual obligations assumed by the other Party and nothing in this Service Agreement will be deemed to constitute either Party a representative of the other Party or to create any fiduciary relationship between the Parties. At all times throughout the term of this Service Agreement, Service Provider shall be an independent contractor to the Company, and shall not, in any manner whatsoever, by any action or deed, or the omission thereof, commit or be deemed to have committed the Company to any obligation irrespective of the nature thereof.

**Section 9.2**    **Assignment.**    This Service Agreement shall not be assigned or transferred by any Party without the written consent of the other Party, which consent shall not be unreasonably withheld.

**Section 9.3**     **Binding Effect.**    This Service Agreement shall be binding upon, and inure to the benefit of, the Parties to this Service Agreement and any successors or assigns acquiring an interest hereunder.

**Section 9.4**     **Notices.**

(a)     All notices, consents, invoices and other communications required, permitted or otherwise delivered under this Service Agreement shall be in writing and maybe telexed, cabled or delivered by hand or mailed by first class registered or certified mail, return receipt requested, postage prepaid, or by nationally recognized express delivery service, charges prepaid, and shall be addressed as follows:

|  |  |
|---|---|
| To the Company: | WeCare Organics LLC<br>9293 Bonta Bridge Road<br>Jordan, NY 13080<br>Attention: Jeffrey LeBlanc,<br>President |
| With a copy to: | Harris Beach PLLC<br>99 Gamsey Road<br>Pittsford, New York 14534<br>Attn: Christopher D. Jagel<br>Fax: 585-419-8818 |
| To Service Provider: | Environmental Protection & Improvement Company, LLC<br><br>227 Route 206<br>Building 1. Box 31<br>Flanders, NJ 07836<br>Attention: President |
| With a copy to: | Synagro Technologies, Inc.<br>435 Williams Court, Suite 100<br>Baltimore, MD  21220<br>Attention:     General Counsel |

(b)     Changes in the respective addresses to which such notices, consents, invoices or other communications may be directed may be made from time to time by either Party by notice to the other Party in accordance with this Section 9.4.

Notices and consents given by mail shall be deemed to have been three (3) Business Days after the date of dispatch; notices and consents given by any other means shall be deemed to have been given when received.

Section 9.5     **Entire Agreement.** This Service Agreement constitutes the entire and complete agreement between the Parties with respect to the subject matter hereof, and supersedes all other agreements, understandings, arrangements, commitments and representations.

Section 9.6     **Other Documents; Further Assurances.** Each Party promises and agrees to execute and deliver any instruments and to perform any acts that may be reasonably requested by the other Party in order to give full effect to this Service Agreement.

Section 9.7     **Applicable Law.** The laws of the State of Delaware shall govern the validity, interpretation, construction and performance of this Service Agreement.

Section 9.8     **Headings.** Captions and headings in this Service Agreement are for ease of reference only and do not constitute an enforceable part of this Service Agreement.

Section 9.9     **Amendment; Waiver.** The Parties to this Service Agreement may agree from time to time to change, modify, amend or waive this Service Agreement or any provisions hereof. Such change, modification, amendment or waiver may occur only pursuant to a written instrument signed by both Parties.

Section 9.10     **Severability.** In the event that any provision of this Service Agreement shall, for any reason, be determined to be invalid, illegal or unenforceable in any respect, the Parties hereto shall negotiate in good faith and agree as to such amendments, modifications or supplements of or to this Service Agreement or such other appropriate actions as shall, to the maximum extent practicable in light of such determination, implement and give effect to the intentions of the Parties as reflected herein, and the other provisions of this Service Agreement shall, as so amended, modified or supplemented, or otherwise affected by such action, remain in full force and effect.

Section 9.11.     **Attorneys' Fees.** In the event that any Party institutes any

legal suit, action or proceeding, against the other Party to enforce the covenants contained in this Service Agreement (or obtain any other remedy in respect of any breach of this Service Agreement), the prevailing Party in the suit, action or proceeding shall be entitled to receive in addition to all other damages to which it may be entitled, the costs incurred by such Party in conducting the suit, action or proceeding, including reasonable attorneys' fees and expenses and court costs.

Section 9.12   **Business Days.**   If any date on which a Party is required to make a payment pursuant to the terms hereof is not a Business Day, then such Party shall make such payment on the next succeeding Business Day.

Section 9.13   **Counterparts.**   This Service Agreement may be executed in any number of counterparts and by the different Parties hereto on separate counterparts, all of which when so executed and delivered will together constitute one and the same instrument.

Section 9.14   **No Consequential or Punitive Damages.** Except as otherwise provided by Applicable Law or in connection with an obligation to indemnify an Indemnified Party for Third Party Claims under Section 8.2 or 8.3, in no event shall either Party hereto be liable to the other or obligated in any manner to pay to the other any special, incidental, consequential, punitive or other similar damages based upon claims arising out of or in connection with the performance or non-performance of its obligations or otherwise under this Service Agreement, whether such claims are based upon contract, tort, negligence, warranty or other legal theory.

IN WITNESS WHEREOF, the Parties hereto have executed this Service Agreement as of the day and year first above written.

WeCare Organics LLC

By: _____

Name: Jeffrey J. LeBlanc

Title: President

Environmental Protection & Improvement
Company, LLC

By:

Name: Chris Dunkerley

Title: Chief Operating Officer

# Exhibit B

## SETTLEMENT AGREEMENT AND MUTUAL RELEASE

This Settlement Agreement and Mutual Release (the "Agreement") is made and entered into by and between ENVIRONMENTAL PROTECTION AND IMPROVEMENT COMPANY, LLC ("EPIC") and WeCare ORGANICS, LLC ("WeCare"). For good and valuable consideration, the receipt and sufficiency of which are mutually acknowledged and agreed by the Parties, the Parties do hereby covenant and agree as follows:

### DEFINITIONS

The following terms as used in this Agreement shall be defined as set forth in subparagraphs (a), (b), and (c) of this paragraph.

a.      All references to "EPIC" shall refer to Environmental Protection and Improvement Company, LLC., and its parent, subsidiaries, affiliates, divisions and any other business entities related to EPIC, and all attorneys, shareholders, officers, directors, managers and employees of EPIC;

b.      All references to "WeCare" shall refer to WeCare Organics, LLC, and its parent, subsidiaries, affiliates, divisions and any other business entities related to WeCare, and all attorneys, shareholders, officers, directors, managers and employees of WeCare;

c.      All references to "Party" or "Parties" shall refer to "EPIC" as defined in the foregoing subparagraph (a), and to "WeCare" as defined in the foregoing subparagraph (b).

### RECITALS

WHEREAS, EPIC and WeCare entered into an agreement whereby EPIC agreed to perform work and services related to the biosolids transportation and disposal services in exchange for WeCare's promise to pay for such work and services (the "Work");

WHEREAS, WeCare has failed to pay for the Work in the amount of $570,522.00 USD;

WHEREAS, the Parties have agreed to settle their dispute and to amicably resolve all their differences.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the Parties, and in consideration of the foregoing recitals and of the mutual covenants and agreements contained herein, and intending to be legally bound, the Parties do hereby covenant and agree as follows:

### AGREEMENT AND RELEASE

1.      **Release of Claims.** Upon full payment of the Settlement Amount set forth in Paragraph 2, and for and in consideration of the Settlement Terms set forth in Paragraph 2, and for and in consideration of the Settlement Terms set forth in Paragraph 2, other good and valuable consideration recited in this Agreement, the receipt and sufficiency of which are hereby acknowledged, the Parties willingly and knowingly do hereby with prejudice RELEASE, ACQUIT, AND FOREVER DISCHARGE each other from any and all past, present

and future claims, suits, losses, damages, liabilities, demands, rights and causes of action, guarantees, claims for compensatory or punitive damages, interest, costs, attorneys' fees, and compensation of any kind or nature whatsoever, whether known or unknown, foreseen or unforeseen, matured or unmatured, developed or undeveloped, discovered or undiscovered, here existing or hereafter arising, based on any matter, act, omission, transaction, occurrence, or event from the beginning of time to the date on which this Agreement is executed, that relates to, arises out of, or is in any way connected with the Work. The Parties expressly acknowledge that this Agreement may be pled as a complete defense and will fully and finally bar any such known or unknown claim or claims by one Party against the other Parties based on any matter, act, omission, transaction, occurrence, or event that has occurred from the beginning of time to the date on which this Agreement is executed.

2.  **Settlement Terms.** In return for the consideration and representations described herein, and other good and valuable consideration recited in this Agreement, WeCare:

a.  Shall pay to EPIC the total amount of Five Hundred Ninety Nine Thousand Forty Eight ($599,048.31) Dollars and Thirty One Cents (the "Settlement Amount") of which Five Hundred Seventy Thousand Five Hundred Twenty Two ($570,522.20) Dollars and Twenty Cents will be paid in Principal and Twenty Eight Thousand Five Hundred Twenty Six (28,526.11) Dollars and Eleven Cents will be paid in interest. The Settlement Amount will be divided into Six (6) monthly installment payments which will set up as follows (with the first payment due on August 25, 2015 and the last payment due on January 25, 2016):

| Outstanding Principal | $570,522.20 | |
| --- | --- | --- |
| Interest Rate | 5% | |
| Total Interest | $28,526.11 | |
| Total Amount owed Including interest | $599048.31 | |
| Due Date | Required Payment | Remaining Balance |
| August 25, 2015 | $99,841.39 | $499,206.92 |
| September 25, 2015 | $99,841.39 | $399,365.53 |
| October 25, 2015 | $99,841.39 | $299,524.14 |
| November 25, 2015 | $99,841.39 | $199,628.75 |
| December 25, 2015 | $99,841.39 | $99,841.36 |
| January 25, 2016 | $99,841.36 | $0.0 |
| | $599,048.31 | $0.0 |

2

i.      Payment shall be made by WeCare to EPIC via Wire Transfer to EPIC to the following PNC bank account: ABA Routing: 031000053, Account Number: 5557250907, and

b.      WeCare may prepay the Settlement Amount in whole or in part prior to the date on which the Sixth (6th) and final installment payment is due without penalty.

3.      **No Admission.** This Agreement is in compromise of disputed claims between the Parties. This Agreement shall not be construed as an admission by either Party, or by any of their current or former employees or agents, of a violation of any federal, state, or local statute, regulation, judicial doctrine, or other law, or a violation of any right of any person or entity. The Parties specifically deny violating any law or committing any unlawful action against the other, or any nther person or entity.

4.      **Acknowledgments.** The Parties specifically acknowledge that they have been given a reasonable period of time to consider this Agreement; they have obtained all advice and counsel they need to understand each of the terms and conditions of this Agreement; they are satisfied with the advice and counsel they have received from their attorneys; and that they enter into this Agreement willingly, freely, voluntarily, knowingly, without coercion or duress, and understanding their rights and interests under, and as they are affected by, this Agreement.

5.      **No Assignment.** The Parties represent and warrant to each other that they have not assigned any pertinent rights to any other person or entity and no person is entitled to assert on its behalf any claim based on or arising out of the Parties' relationship with each other. Each Party agrees to defend, indemnify and save the other Parties harmless from any claim or claims that are asserted by any assignee, or any other person or entity bringing an action, for any alleged actions based on the Parties relationship.

6.      **Default and Acceleration.** If WeCare fails to comply with the terms and conditions of this Agreement, it will be in default of this Agreement. In the event of default, EPIC may declare the unpaid balance immediately due, and may seek any and all damages as a result of WeCare's default including, but not limited to, the unpaid balance amount, compensatory, consequential, and/or incidental damages, lien on WeCare's assets, interest at a rate not exceeding the legal rate of interest for the Commonwealth of Pennsylvania, reasonable attorneys' fees and costs as well as any other remedy permitted by law.

7.      **Binding Effect.** This Agreement shall be binding upon all Parties and upon their next of kin, heirs, attorneys, representatives, administrators, executors, successor, and assigns.

3



8.   **Governing Law.** This Agreement shall be interpreted, enforced, and governed under the laws of the State of Maryland. The language of all parts of this Agreement shall in all cases be construed as a whole, according to its fair meaning, and not strictly for or against any of the Parties.

9.   **Severability.** If any provision of this Agreement is declared or determined by any court to be illegal or invalid, that part shall be excluded from the Agreement, but the validity of the remaining parts, terms, or provisions shall not be affected.

10.   **Entire Agreement.** This Agreement is the final written expression and the complete and exclusive statement of all of the agreements, conditions, promises, representations, and covenants between the Parties with respect to the subject matter hereof, and supersedes all prior or contemporaneous agreements, negotiations, representations, understandings and discussions between and among the Parties, their respective representatives, and any other person or entity, with respect to the subject matter hereof. This Agreement is the product of negotiation between counsel for the Parties and shall not be deemed to have been drafted by any single party nor shall any party to this Agreement make such a claim.

11.   **Modification.** Each Party to this Agreement understands, acknowledges and agrees that this Agreement may not be altered, amended, modified, or otherwise changed in any respect whatsoever except by a duly executed writing signed by all Parties and this provision cannot be orally waived.

12.   **Counterparts and Fax and Electronic Mail Signatures.** This Agreement may be executed or signed in any number of counterparts and by different parties in separate counterparts, which counterparts shall constitute a single, integrated agreement binding upon all the signatories to such counterparts. Signatures may be delivered by facsimile or electronic mail transmission and such signatures shall be treated as originals thereof.

THE UNDERSIGNED ACKNOWLEDGE AND AGREE THAT THEY HAVE CAREFULLY READ THIS "SETTLEMENT AGREEMENT AND MUTUAL RELEASE"; KNOW AND UNDERSTAND ITS CONTENTS; FREELY AND VOLUNTARILY AGREE TO ABIDE BY ITS TERMS, ARE FULLY AUTHORIZED TO SO AGREE AND BE BOUND; AND THEY HAVE NOT BEEN COERCED INTO SIGNING THIS AGREEMENT.

IN WITNESS WHEREOF, the Parties have executed this Agreement on the day and year first below written.

[Signature blocks on next page]

4



ENVIRONMENTAL PROTECTION AND
IMPROVEMENT COMPANY, LLC

By: _____

Printed Name: _DIANA K. Feord_

Title: _General Counsel_

Date: _2015-7-31_


WECARE ORGANICS, LLC

By: _____

Printed Name: _Jeffrey J. LeBlanc_

Title: _PRESIDENT_

Date: _7/30/15_

5

# Exhibit C



**Alan Slepian, Esq.**
Deputy General Counsel
443-489-9167 **direct**
443-489-9043 **fax**

aslepian@synagro.com **email**
People + Planet -> Synchronization
www.synagro.com
435 Williams Court, Baltimore, MD 21220

October 6, 2015

**VIA FEDERAL EXPRESS & EMAIL**

Jeff LeBlanc, President
WeCare Organics, LLC
9293 Bonta Bridge Road
Jordan, New York 13080

RE:   Settlement Agreement and Mutual Release between
      Environmental Protection and Improvement Company ("EPIC") and
      WeCare Organics, LLC ("WeCare") dated July 31, 2015 (the "Agreement")

Dear Mr. LeBlanc,

On behalf of EPIC, this letter constitutes formal notice that we have not received your required monthly payment in the amount of $99,841.39 due on September 25, 2015 per the Agreement. That payment is now 12 days past due and WeCare is in default of the Agreement. All attempts to reach you by phone or e-mail have either failed or been ignored. Accordingly, EPIC demands that the required monthly payment that was due on September 25, 2015 be made no later than close of business on Friday, October 9, 2015.  Per the Agreement, the payment must be sent to EPIC via Wire Transfer to the following PNC bank account:  ABA Routing: 031000053, Account Number: 5557250907.  If we do not timely receive this payment, then in accordance with paragraph 6 of the Agreement, the unpaid balance of $499,206.92 shall be immediately due and payable on Monday, October 12, 2015, and EPIC will take legal action to obtain payment of such amount as well as any and all damages as a result of WeCare's default including, but not limited to compensatory, consequential, and/or incidental damages.

Sincerely,

Alan Slepian
Deputy General Counsel

cc: Raymond Sittig, Vice President of EPIC

# Exhibit D

-----Original Message-----
From: Wes Gregory [mailto:cwg.3@wecarecompanies.com]
Sent: Wednesday, October 07, 2015 3:52 PM
To: Al Slepian
Cc: Jeffrey LeBlanc
Subject: Note for WCO

Mr Slepian we acknowledge that our second payment to Synagro is late and we are sorry this has occurred . When we negotiated our agreement with your company we were in the process of believing we were going to be able to refinance our company and pay this debt off at the timetable agreed to . Since that time we have made the one payment but unfortunately we have not completed our refinancing arrangement at the present time . We are operating and have cash flow but will find it difficult without refinancing to maintain the current agreed schedule of 99,841.39 per month . We respectfully request that you consider a less aggressive pay down schedule so we can cash flow our debt to your company . I believe at this time without refinancing we could afford somewhere between 30,000 to 50,000 per month . We wish to pay our debt to you but without refinancing concluded I don't think we can meet the current schedule and would ask you to consider the option above . We can try and make 100,000 payments at a time I just don't think we can make them with our current cash flow on the times set forth . I would appreciate any suggestions or help you would consider at this time .
Wes Gregory

Sent from my iPad